**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

03 JUL 14 PM 3: 50

U.
N.D. OF ALABAMA

| | |
|---|---|
| NICOLE JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil Action No. CV-02-S-0260-NE |
| | ) |
| KNOLOGY OF HUNTSVILLE, INC., | ) |
| and KNOLOGY OF ALABAMA, INC., | ) |
| | ) |
| Defendants. | ) |

ENTERED

JUL 14 2003

**MEMORANDUM OPINION**

Plaintiff, Nicole Johnson, claims that her former employer, Knology of Huntsville, Inc. ("Knology" or "defendant"),[1] denied her equal pay, fringe benefits, and terminated her employment because of her race (African American), and (or) in retaliation for her complaints about (and objections to) discrimination in the workplace, and, her action in filing a charge of discrimination with the EEOC, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The action now is before the court on defendant's motion for summary judgment (doc. no. 42), plaintiff's opposition to summary judgment (doc. no. 51), defendant's motion to file a reply brief (doc. no. 54), and plaintiff's opposition to defendant's motion to file a reply brief (doc. no. 56).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[1] Knology of Huntsville, Inc. is a subsidiary of Knology of Alabama, Inc. For simplicity, the two entities will be referred to as "Knology" or "defendant," unless otherwise specified.

of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted, except for those portions of plaintiff's race discrimination and retaliation claims arising from the termination of her employment. Further, defendant's motion to file a reply brief will be denied.

## I. SUMMARY OF FACTS

Knology is a broadband services provider that offers residential and commercial customers local- and long-distance telephone service, high-speed internet access, and analog- and digital-cable television service.[2] Plaintiff began her employment with Knology on February 2, 2000, working as

---

[2] Defendant's evidentiary submissions, Palermo declaration ¶ 4.

a traffic coordinator in its cable television advertising department, earning a wage of $9.00 an hour.[3]
As traffic coordinator, plaintiff was responsible for scheduling commercial advertisements, billing
advertising clients, entering related data in the company computer system, and answering the
telephone.[4]  In performing such tasks, plaintiff worked with, and was later supervised by, Mike
Long, Traffic and Insertion Supervisor.[5]  Plaintiff and Long were, in turn, supervised by Pam Pruitt,
Advertising Sales Manager.[6]  Pruitt's supervisor was Taylor Nipper, Senior Director of Marketing.[7]

## A.    Plaintiff's Job Performance and Termination

Knology contends that "[p]laintiff's job performance declined markedly in approximately
October, 2000, resulting in errors that were costly."[8]  Defendant details nine incidents in support of
that assertion:

1.    In October of 2000, plaintiff failed to properly schedule commercials that were supposed to
      air during a football game.  As a result, a client's advertisements were not aired as
      contracted.[9]

      (a)    Plaintiff denies responsibility for this error, saying that she was told by Pruitt to
             place the unaired contracts "on hold," and that "no account rep or Pam [Pruitt] ever
             came back and told me to take it off hold."[10]

2.    In December of 2000, plaintiff entered a client's commercial schedule into Knology's
      computer system on two occasions, rather than just once, which caused several other clients
      to be "bumped" out of prime time slots, and cost defendant advertising revenue.

---

[3] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 55-56.

[4] Defendant's evidentiary submissions, Tab H (Johnson Job Description Questionnaire).

[5] Plaintiff's evidentiary submissions, Tab J (Long deposition), at 48; Tab A (Johnson deposition), at 63.
Plaintiff explained that "[m]e and Mike Long worked together, so it was not as if he would tell me what to do. . . ." *Id.*
She later adds, however, that after he was promoted in May of 2001, Long was in her supervisory chain of command.
*Id.* at 177.

[6] *Id.*, Tab A (Johnson deposition), at 63-64.

[7] *Id.*, Tab G (Nipper deposition), at 10; Tab B (Pruitt deposition), at 29.

[8] Defendant's brief, at 5.

[9] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 143.

[10] *Id.*

(a)     Again, plaintiff denies responsibility for the error, saying that an account representative provided her with a revised version of an earlier-entered contract, but did not properly identify it as such. Plaintiff thus assumed that the revised contract was, in fact, a new order, and entered it into the computer system without deleting the information entered previously.[11]

3.     In December of 2000, plaintiff made "several" unspecified mistakes "with her traffic and billing duties for which she was reprimanded verbally."[12]

(a)     Plaintiff could not recall receiving any reprimands.[13]

4.     In January of 2001, "plaintiff failed to double-check the commercial schedule she entered for the bowl games which resulted in incorrect client commercials being aired during college football bowl games. The error proved to be costly for Knology."[14]

(a)     Plaintiff asserts that she *did* detect the anomaly and brought it to Pruitt's attention, and that Pruitt instructed her not to change the schedule.[15]

5.     In February of 2001, plaintiff violated company policy by altering a commercial schedule without obtaining prior approval from management.[16]

(a)     Plaintiff's only response to this criticism is to say that the Caucasian female who replaced her as traffic coordinator, Rebecca Wright, is not required to obtain permission to alter an advertising schedule.[17]

6.     "In February of 2001, plaintiff failed to alert Long that a scheduled commercial was not airing." The error resulted in lost revenues to defendant, as well as a "dissatisfied client."[18]

(a)     Plaintiff did not provide a specific response to this accusation.

7.     On an unspecified date, plaintiff "inappropriately and unilaterally" changed an invoice reflecting the amount of money owed to defendant without seeking prior approval. This anomalous change caused the company's auditors to expend "vast amounts of time

---

[11] *Id.* at 144-45.

[12] Defendant's brief, at 6.

[13] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 228.

[14] Defendant's brief, at 7.

[15] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 149.

[16] Defendant's brief, at 7.

[17] Plaintiff's evidentiary submissions, Tab D (Wright deposition), at 33-34.

[18] Defendant's brief, at 7.

attempting to ascertain the cause for the [accounting] discrepancy."[19]

    (a)    Plaintiff did not provide a specific response to this accusation.

8.    On an unspecified occasion (or occasions), plaintiff "abused the privilege to use a corporate gas card."

    (a)    Plaintiff's only response is to say that she "was never told that [her] gas card usage was excessive. . . ."[20] (Plaintiff's use of the corporate gasoline card is discussed in greater detail in § I(D) *infra*.)

9.    On another, unspecified occasion, plaintiff "abused the privilege of using the company van," by driving it more than two hundred miles during a two-day period.[21]

    (a)    Plaintiff responded by asserting that her use of the company-owned vehicle "pales in comparison" to that of Mike Long, who used the van as his personal vehicle for several months.[22] (A more detailed examination of the employees' use of the van is discussed in § I(D)(3) *infra*.)

Defendant asserts that plaintiff's March 1, 2001 annual performance review reflected the foregoing incidents: she was told that "Improvement [was] Desired" by management, because she received only two (out of a possible five) points on Knology's employee-performance assessment-instrument.[23] Plaintiff alleges that she *verbally* lodged several objections to her annual performance review with her supervisor, Pam Pruitt; and, that Pruitt promised to record her comments on the review form, but failed to do so.

Plaintiff candidly admits in her brief filed in opposition to summary judgment that she made "some mistakes while working for Defendant, as did all employees."[24] She adds, however, that no

---

[19] *Id.*

[20] Plaintiff's evidentiary submissions, Tab O (Johnson declaration) ¶ 6.

[21] Defendant's brief, at 6-8.

[22] Plaintiff's brief, at 14.

[23] Defendant's evidentiary submissions, Tab B (Johnson performance review 3/1/01). The copy provided to the court is not signed or dated, but the parties do not dispute its authenticity, nor the date that defendant asserts that it was issued. *See* defendant's brief, at 6.

[24] Plaintiff's brief, at 14.

written record was made of her perceived shortcomings until the spring of 2001 — a time frame that coincides with both plaintiff's March 1, 2001 annual performance review, and, her participation in an internal investigation of racial harassment claims lodged by co-worker Adrienne Awoniyi. (The Awoniyi investigation is examined in detail in §I(C) *infra*.)

Plaintiff claims that defendant's lack of documentation of her "mistakes" prior to April of 2001 prevent her from responding to those allegations with any specificity.[25] Plaintiff also notes that none of the alleged errors were detailed in her March, 2001 performance evaluation.[26] Even so, plaintiff's overall assessment of "Improvement Desired" clearly indicates that Pruitt was not satisfied with plaintiff's job performance.

Plaintiff met with supervisor's Pam Pruitt and Taylor Nipper, Senior Director of Marketing, on May 8, 2001, to request a pay raise. Nipper reviewed plaintiff's work history, and stated that it did not warrant a wage increase.[27] Instead, plaintiff was counseled about her deficiencies, and was placed on "90-day review," which meant that her performance would be re-evaluated at the end of that period.[28] Plaintiff executed a "Corrective Action Report" (which documented Nipper's verbal counseling) at the conclusion of the meeting.[29]

Soon after the May 8th meeting, plaintiff took two weeks of medical leave to recuperate from an episode of carpal tunnel syndrome.[30] One of her co-workers, Kim Neighbors, called plaintiff while she was at home, and said that she had overheard Pam Pruitt say "Nicole does not have any

---

[25] *Id.*

[26] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at Exhibit 12 (Johnson performance review).

[27] Defendant's evidentiary submissions, Nipper deposition, at 48-50.

[28] *Id.* at 51-60.

[29] *Id.*, Tab A (Johnson Corrective Action Report 5/8/01).

[30] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 179; plaintiff's brief at 8.

medical problems. We will have a new traffic coordinator by Monday."[31] Plaintiff's job duties were performed during her medical leave by a temporary employee named Rebecca Wright, a Caucasian female.

Plaintiff returned to work on or about May 24, 2001, but medical restrictions prevented her from keyboarding until June 14, 2001.[32] In the meantime, she was assigned alternate duties in the sales department. Additionally, plaintiff was unable to return to her old work area, because the door locks to the traffic and advertising department had been changed during her absence,[33] and she was not immediately issued a new key. Plaintiff adds that, even after her medical restrictions were lifted, Pruitt did not allow her to return to her old job.[34]

During May and June of 2001, Pruitt and Mike Long, Knology's Traffic and Insertion Supervisor, became increasingly dissatisfied with plaintiff's job performance, and drafted several documents detailing perceived deficiencies.[35] Plaintiff was again counseled by Pruitt regarding her work performance on June 6, 2001, and issued another "Corrective Action Report."[36] Plaintiff delivered a written response, generally defending her job performance, to Pruitt's office on June 15, 2001.[37]  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on June 22, 2001, accusing defendant of discriminating against her because of her race

---

[31] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 114.

[32] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at Exhibit 9 (Johnson medical excuse May 9, 2001).

[33] *Id.* Pruitt explains that Long changed the locks because he "was afraid of [plaintiff]" and did not want her to have access to the department during her medical leave. *Id.*, Tab B (Pruitt deposition), at 181. Plaintiff was given a key to the new locks at some unspecified point after she returned from medical leave. *Id.* at 182.

[34] *Id.* at 116.

[35] *Id.*, Tab K (Moore affidavit #1), at Exhibit 2 (undated Long notes detailing events that occurred up until May and June of 2001); Exhibit 3 (undated Long notes detailing events that happened from May 7-14, 2001); Exhibit

[36] *Id.*, Exhibit 13 (Johnson Corrective Action Report June 6, 2001).

[37] *Id.*, Exhibit 14 (Johnson response June 8, 2001).

and color, as well as retaliation.[38]

The parties were unable to voluntarily conciliate their differences and, on June 25, 2001, plaintiff was accompanied by her husband (Lucius Johnson) to a meeting with Allan Goodson (General Manager for Knology of Huntsville),[39] Tony Palermo (Vice President of Sales, Marketing, and Operations),[40] and Taylor Nipper (Senior Director of Marketing), during which her employment was terminated.  (Plaintiff concealed a tape recorder on her person and surreptitiously recorded the meeting,[41] but neither the tape itself, nor a transcript of it, were included in the parties' evidentiary submissions.)  Defendant's stated reasons for plaintiff's termination were summarized in a one-page memo given to her, and stating that she had not improved her job performance since her last counseling, and that "[s]erious [unspecified] mistakes continue to be brought to light."[42] Additionally, defendant discovered that plaintiff had been using her workplace internet connection to search employment websites for employment opportunities.[43]

## B.    Plaintiff's Participation in the Investigation of a Co-Worker's Race Discrimination Claims

Adrienne Awoniyi, an African American female who was employed by defendant as an Advertising Sales Account Executive,[44] lodged an internal complaint of racial harassment against Pam Pruitt on April 18, 2001.[45]  Knology's Human Resources Administrator, Cassie Carlisle,

---

[38] *Id.*, Exhibit 16 (Johnson EEOC charge June 22, 2001).

[39] Plaintiff's evidentiary submissions, Tab E (Goodson deposition), at 8.

[40] *Id.*, Tab F (Palermo deposition), at 11.  At deposition, Palermo stated that he did not know whether he was an employee of Knology of Alabama, Inc. or Knology of Huntsville, Inc., saying "I don't know how that rolls up from a legal standpoint." *Id.*

[41] *Id.*, Tab A (Johnson deposition), at 16-17.

[42] *Id.*, Tab K (Moore affidavit #1), at Exhibit 31 (Undated memo from Pruitt and Nipper to Johnson).

[43] *Id.*

[44] Defendant's evidentiary submissions, Awoniyi deposition, at 38.

[45] Plaintiff's evidentiary submissions, Tab K (Moore affidavit #1), at Exhibit 9 (Summary of Awoniyi investigation May 1, 2001).

initiated an investigation.  She conducted telephone interviews with several employees in the advertising department, including numerous conversations with plaintiff.[46] Plaintiff complained that Pruitt had nicknamed her (plaintiff) "Queen Latifah" and "Queen of Traffic;"[47] and added that, one day during February of 2001, Pruitt had telephoned and, "out of the blue," called her a "black piece of tar."[48]  (At the time, plaintiff asked Pruitt, "Who are you talking to?," but did not mention the incident to anyone above Pruitt until speaking with Carlisle during the Awoniyi investigation.[49] Even so, another co-worker, Kim Neighbors, confirmed that she heard Pruitt refer to plaintiff as "a big black piece of tar."[50])

After completing her investigation, Carlisle concluded that Pruitt permitted too "lax" an atmosphere to prevail in her department.  Carlisle, nevertheless, found no evidence of racial discrimination or harassment.[51]  Further, Awoniyi did not file an EEOC charge or civil action.[52] Nevertheless, at Carlisle's suggestion, an advertising department meeting was held on May 2, 2001, during which Pruitt addressed the workplace concerns raised during Carlisle's investigation and formally apologized for any offensive actions or statements.[53]  Pruitt also complied with Carlisle's suggestion to attend diversity awareness and "effective communication" courses.[54]

## C.     Retaliatory Actions

Plaintiff alleges that Pruitt retaliated for her participation in the Awoniyi investigation.

---

[46] *Id.*

[47] *Id.*, Tab B (Pruitt deposition), at 113.  *See* discussion at § I(D) *intra.*

[48] *Id.*, Tab A (Johnson deposition), at 75-77.

[49] *Id.* at 76.

[50] *Id.*, Tab N (Neighbors affidavit) ¶ 10.

[51] Defendant's evidentiary submissions, Exhibit P (Jackson memo May 4, 2001).

[52] *Id.*, Awoniyi investigation, at 124-25.

[53] Plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 146, 149-50.

[54] *Id.* at 146.

### 1.    Plaintiff's cellular telephone.

Prior to November of 2000, all of Pruitt's subordinates, with the sole exception of plaintiff, had been issued cellular telephones.[55]  At deposition, Pruitt explained that all employees working in her department, except plaintiff, needed a cellular telephone to perform their job.[56]  Plaintiff has not disputed this contention.  Even so, when Pruitt received a new cellular telephone in November of 2000, she gave her old unit to plaintiff, "because I didn't have time to call each . . . client[] and let them know I had a new number.  So I left a message on [the cell phone issued to plaintiff], and I told [plaintiff] to keep this phone and make sure that whoever called, she gave [them] my new phone number . . . ."[57]  The telephone was taken back in June of 2001, and plaintiff perceived the act as retaliation for her participation in the Awoniyi investigation.[58]  Defendant asserts that the phone was not taken away in retaliation, but out of business necessity.  Mike Long explained during deposition that he was assigned the telephone after he gave his previously-assigned telephone to a manager who was traveling out of town because, unlike plaintiff, Long's job entailed the regular use of a cellular telephone.[59]

### 2.    Plaintiff is ordered to inform her supervisor before going to lunch.

Plaintiff declares that, "[b]efore I complained of race discrimination during the Adrian Awoniyi investigation, I  never had to inform Pam Pruitt or anyone in the ad/sales department . . . at Knology . . . when I was leaving for lunch or when I was going to return."[60]  Subsequent to the

---

[55] *Id.*, Tab B (Pruitt deposition), at 120-21.

[56] *Id.*

[57] *Id.* at 121.

[58] Plaintiff's brief opposing summary judgment, at 7; Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 85-86.

[59] Plaintiff's evidentiary submissions, Tab J (Long deposition), at 198-99.

[60] *Id.*, Tab O (Johnson declaration) ¶ 3.

Awoniyi investigation, however, Pruitt began to require plaintiff to inform her when she departed and returned from lunch breaks. Plaintiff asked Pruitt, "Is anybody else in this department having to go by these same rules?" Pruitt replied, "No, just you."[61] Pruitt explained her action by asserting that, since plaintiff was not eating lunch with her fellow employees, the only way to keep track of her whereabouts was to have plaintiff report in and out. At deposition, Pruitt stated that "[w]hen [plaintiff] stopped eating lunch with everybody else . . . she was pretty much keeping to herself. She was going to lunch at a different time, and that's when I asked her to just let me know when she was going."[62]

### 3.    Plaintiff is no longer allowed to make personal use of the company van.

Pruitt apparently allowed employees to make *personal* use of the company van prior to the Awoniyi investigation, because plaintiff claims that she was denied use of the vehicle afterwards.[63] She does not specify the date(s) on which she was refused such use, however. The record reflects that Pruitt permitted plaintiff to make personal use of the company van one weekend (presumably, prior to the Awoniyi investigation), because plaintiff's personal vehicle had broken down.[64] Defendant asserts that, on the one occasion plaintiff was allowed personal use of the company van, she abused the privilege by driving the vehicle more than two hundred miles in a two-day period.[65] At deposition, plaintiff attempted to explain the excessive mileage by testifying that, *during her lunch break*, she got lost while traveling from her workplace to her home and the local post office.[66]

---

[61] *Id.*, Tab A (Johnson deposition), at 84.

[62] *Id.*, Tab B (Pruitt deposition), at 203.

[63] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 97-98.

[64] *Id.*

[65] *Id.* at 98-99.

[66] *Id.* at 99.

Pruitt explained at deposition that the policy regarding use of the company van did not change because of plaintiff's activities, but because Pruitt subsequently had been instructed by defendant's general manager, Allan Goodson, that the van was to be only used for business purposes.[67] Plaintiff asserts that, despite the change in policy, other employees subsequently were permitted to make "personal use" of the company van. She cites as an example an occasion on which Mike Long and several of plaintiff's co-workers (some of whom were, like plaintiff, individuals of African American ancestry) purportedly took the vehicle to the "Six Flags" amusement park near Atlanta, Georgia, in conjunction with a company-sponsored outing.[68] Defendant counters by stating that plaintiff is mistaken, and that the employees were transported to Six Flags in a limousine owned by a business associate identified only as "Frankie."[69] The record does not definitively address whether plaintiff was invited to ride in the limousine, or otherwise offered free transportation to Six Flags.[70] Plaintiff did receive four free admission tickets to the park.[71] Notwithstanding that gift, plaintiff complains that she "needed five [admission tickets], because there are five [people] in [her] family."[72] Even so, plaintiff could not identify any employee who received more than four free tickets to the Six Flags outing.[73]

Plaintiff also claims that Mike Long utilized the company van as his personal vehicle for some unspecified period of time.[74] Defendant responds by explaining that plaintiff's observation

---

[67] Plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 124.

[68] *Id.*, Tab A (Johnson deposition), at 98.

[69] *Id.*, Tab J (Long deposition), at 181-82.

[70] *Id.* at 183.

[71] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 106.

[72] *Id.*

[73] *Id.* at 107.

[74] *Id.*, Tab N (Neighbors affidavit) ¶ 13.

mischaracterizes Long's *official* use of the vehicle during evening hours and on weekends to respond to "trouble calls" regarding the computer system that aired the commercial advertisements of Knology's clients.[75]

### 4.    Plaintiff is given "to-do lists" by Pruitt.

Subsequent to the Awoniyi investigation, Pruitt began to issue plaintiff "to-do lists" — *i.e.*, an itemization of tasks to be performed each day.[76] During this same period, some of plaintiff's job duties (such as operating a computer keyboard) had been medically restricted as a result of treatment for carpal tunnel syndrome.[77] Even so, plaintiff did not interpret Pruitt's assignment of tasks *via* the "to-do lists" as an accommodation of her medical condition. Instead, plaintiff asserts that "Pruitt started giving [her] the lists *before* she went on medical leave (but after the Awoniyi investigation)."[78] Notably, plaintiff began receiving the "to-do" lists around the same time that she requested a pay raise.

Five "to-do lists" are included in the evidentiary submissions, dated May 7, 10, 29, 30, and June 6, 2001.[79] The tasks listed appear to be typical office duties, but plaintiff found some to be demeaning, because she testified that Pruitt "had me watering plants, cleaning up other employees' desks. She had me . . . mak[ing] copies."[80]

### 5.    Plaintiff is not permitted to leave work early on Fridays.

Plaintiff explains that, prior to her participation in the Awoniyi investigation, everyone in

---

[75] *Id.*, Tab B (Pruitt deposition), at 204.

[76] *Id.*, Tab A (Johnson deposition), at 121.

[77] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at Exhibit 9 (Johnson wrist injury documentation). Interestingly, plaintiff's attending physician regarding her wrist injury was Adrienne Awoniyi's father. *Id.* at 134.

[78] Plaintiff's brief, at 9 (emphasis in originial).

[79] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at Exhibit 7.

[80] *Id.* at 121.

her department was regularly permitted to leave work early on Fridays. Afterwards, plaintiff was the only employee compelled to work until five o'clock p.m.[81] Defendant responds by stating that plaintiff was compelled to work her entire shift on Fridays after she complained about not receiving a pay raise. Pruitt explains that she "asked [plaintiff] to stay every day until 5:00 and try and improve her skills and do a much better job."[82] Further, it is undisputed that plaintiff was the only hourly employee in her department.

### 6. Plaintiff is no longer invited to group lunches or allowed to make personal use of "trade accounts" without permission.

Knology engages in some bartering — that is, it trades its services for the services of some clients, without exchanging money. Essentially, a participating client's bill from defendant is reduced by the amount (or value) of services provided to defendant's employees.[83] These barter arrangements are referred to by defendant as "trade accounts."[84] Plaintiff had her personal vehicle repaired at a local garage pursuant to this practice, her family received at least three free meals at a local restaurant, and she was given four tickets to Six Flags.[85] Plaintiff asserts that, following her participation in the Awoniyi investigation, Pruitt retaliated by telling her that trade accounts were no longer available. Plaintiff later overheard Pruitt tell another employee that the trade accounts actually were still available to other employees.[86] Pruitt denies that plaintiff was denied use of the trade accounts.[87] In her argument opposing summary judgment, however, plaintiff states that, in

---

[81] *Id.* at 110-11.

[82] *Id.*, Tab B (Pruitt deposition), at 205.

[83] *Id.* at 133.

[84] *Id.*

[85] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 106, 108-09; Tab J (Long depositon), at 190-201.

[86] *Id.* at 136.

[87] *Id.*, Tab B (Pruitt deposition), at 137.

fact, she was merely curtailed from making personal use of the trade accounts without obtaining prior permission from Pruitt.[88]

In a similar vein, plaintiff complains that, after the Awoniyi investigation, she no longer was invited to group lunches. It is not clear whether these lunches were billed to the company's trade accounts. Long explains that he stopped inviting plaintiff to these lunches because she regularly declined the offer.[89] However, one of plaintiff's co-workers, Kim Neighbors, states that, "[a]fter the Awoniyi investigation, I am aware that [plaintiff] was excluded from lunch. I know this because Cindia Riise Myrick told me that [plaintiff] was not allowed to go to lunch with the group anymore."[90]

### 7. Plaintiff is no longer permitted to make personal use of the corporate gasoline card.

During the first year or so of plaintiff's employment with defendant, she and her fellow employees were permitted to use a company-owned credit-card to purchase gasoline for their personal vehicles. Pruitt rescinded that privilege at some unspecified point in 2001.[91] Pruitt explained that, once the department received a company-owned van, there no longer was any need for plaintiff and her co-workers to perform company errands in their personal vehicles and, thus, their access to the corporate gasoline card was no longer warranted.[92]

Plaintiff claims, however, that Pruitt denied her access to the company gasoline card to retaliate for her participation in the Awoniyi investigation. In support of that contention, plaintiff

---

[88] Plaintiff's brief opposing summary judgment, at 32.

[89] Plaintiff's evidentiary submissions, Tab J (Long deposition), at 162.

[90] Id., Tab N (Neighbors affidavit) ¶ 11.

[91] Plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 128-29.

[92] Id.

notes that Pruitt gave the gasoline card back to Long.[93]  Pruitt explains that Long was given the company gasoline card because he was required to drive the company van while "on call" for trouble calls regarding Knology's advertising computer system.[94]

## D.    Other Alleged Discriminatory Statements by Pruitt

Defendant states that a "joking atmosphere" prevailed in plaintiff's office during the first months of her employment.[95]   While plaintiff admitted at deposition that she "would joke sometimes"[96] as well, she claims that some of the "jokes" directed at her constituted racial harassment.  Plaintiff complains that Pruitt, Long, and other employees frequently referred to her as "Queen Latifah,"[97] or the "Queen of Traffic."[98] On one occasion, Long changed plaintiff's caller identification information on her office telephone so that "Queen Latifah" would be displayed on any "caller ID" equipped telephone that received a call from plaintiff's line.[99]  On her birthday in September of 2000, plaintiff received a birthday card from fellow employees, reading "Roses are red.  Violets are blue.  You may be Nicole, But you are Latifah too!  Happy Birthday!"[100]  The card was signed by six of plaintiff's fellow employees, one of whom was Pruitt.

Plaintiff never complained that she did not enjoy the nicknames until she participated in the Awoniyi investigation.[101]  Rather, when Pruitt called plaintiff "Queen Latifah," she would respond

---

[93] *Id.*, Tab A (Johnson deposition), at 83-84.

[94] *See* § I(D)(3) *supra*; plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 130.

[95] Defendant's brief, at 5.

[96] Defendant's evidentiary submissions, Johnson deposition, at 122.

[97] Queen Latifah is an African American female rap musician. *See* plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 71.

[98] *Id.*, Tab B (Pruitt deposition), at 113, Tab J (Long deposition), at 157.

[99] *Id.*, Tab J (Long deposition), at 153-54.

[100] *Id.*, Tab A (Johnson deposition), at Exhibit 7 (Johnson birthday card).

[101] *Id.*, Tab B (Pruitt deposition), at 113.

-16-

by simply saying, "My name is Nicole."[102] Plaintiff considered the references to be racial slurs, and notes that Pruitt "only called me that. She didn't call any other white employees . . . that."[103]

At some unspecified point *after* the Awoniyi investigation, plaintiff overheard Pruitt talking on the telephone in her office. During that conversation, Pruitt told the other party that "she was not going to hire any more black employees in her department because they were too much trouble."[104]

On another occasion, while plaintiff was on medical leave in May of 2001, plaintiff's former co-worker, Kim Neighbors, heard Pruitt say, "until we can get rid of [plaintiff], I'm going to have her make phone calls . . . ."[105]

Plaintiff also relates that Pruitt often referred to customers of Asian ancestry as "REPITAs," an acronym meaning "Rice [E]ating [P]ains [I]n [T]he [A]ss."[106] Pruitt admitted to using this pejorative term, but only in reference to Asian customers who were rude to her employees.[107]

Neighbors also heard Pruitt say on some unspecified occasion that, "if she drank one more Grapico [soft drink], she would turn black."[108]

Finally, plaintiff testified that Pruitt told her "You are a worthless piece of shit." Plaintiff could not recall how many times Pruitt said this to her — thereby implying that it was more than once — nor could she recall the date(s) upon which Pruitt uttered such statement(s).[109]

## E.   Disparities in Pay

---

[102] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 74.

[103] *Id.* at 72-73.

[104] *Id.*, Tab A (Johnson deposition), at 86-87.

[105] *Id.*, Tab N (Neighbors affidavit) ¶ 16.

[106] *Id.*, Tab A (Johnson deposition), at 235.

[107] *Id.*, Tab B (Pruitt depositon), at 209.

[108] *Id.*, Tab N (Neighbors affidavit) ¶ 9.

[109] *Id.*, Tab A (Johnson deposition), at 140-41.

Plaintiff was paid an hourly wage of $9.00 during her employment with defendant.  She notes that, while she was on medical leave during May of 2001, her Caucasian substitute, a temporary employee named Rebecca Wright, was paid a wage of $10.00 an hour.[110]  Plaintiff contends that, despite the fact that Wright was a temporary employee, her salary was set by defendant.[111]  Wright was paid $10 an hour until she resigned her employment with the temporary employment agency in August of 2001, because she found a job at an ice skating rink that paid $11.50 an hour.[112]

During the ensuing months, defendant filled the traffic coordinator position with several other temporary employees.[113]  During the same period, Wright became "frustrated" with her job at the ice rink and called Mike Long to see whether any job openings were available.[114]  In response, defendant offered Wright a salary of $13 an hour.  Wright eventually accepted the offer, and she was hired as defendant's permanent traffic coordinator in June of 2002.[115]

Plaintiff claims that the higher salary paid to Wright, both during her tenure as a temporary employee, and later as a permanent employee, was discriminatory.[116]

## II. DISCUSSION

**A.    Whether Knology of Alabama, Inc. Should Be Dismissed as a Defendant**

The brief filed in support of summary judgment asserts that Knology of Huntsville, Inc., as opposed to Knology of Alabama, Inc., was plaintiff's "employer" for the purpose of Title VII

---

[110] Plaintiff's evidentiary submissions, Tab D (Wright deposition), at 11-12.

[111] *Id.*, Tab H (Carlisle deposition), at 114-15.

[112] *Id.*, Tab D (Wright deposition), at 11-12.

[113] *Id.*, Tab B (Pruitt deposition), at 191-92.

[114] *Id.*, Tab D (Wright deposition), at 24-25.

[115] *Id.* at 10.

[116] Plaintiff's brief, at 29.

liability and, as such, is the only proper defendant. Plaintiff's brief opposing summary judgment does not address that argument. Accordingly, Knology of Alabama, Inc., is due to be dismissed as a defendant, and all of plaintiff's Title VII claims against that entity will be dismissed with prejudice. *See* Fed. R. Civ. P. 56;[117] *cf. Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned).[118] Notably, however, no argument was made as to why Knology of Alabama, Inc. should be dismissed as a defendant to plaintiff's § 1981 claims. Accordingly, that entity shall remain in this action as a defendant to claims based upon that statute.

## B.  Judicial Estoppel

Plaintiff filed a voluntary Chapter 7 bankruptcy petition on April 20, 2001.[119] Soon thereafter, on April 26, May 2, and June 8, 2001, plaintiff was interviewed by defendant's human

---

[117] Federal Rule of Civil Procedure 56(e) provides, in pertinent part, that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

[118] Contentions that are not addressed in a party's responsive brief are deemed abandoned. *See, e.g., Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).

[119] Defendant's evidentiary submissions, Tab Q (Johnson bankruptcy final decree).

resources administrator, Cassie Carlisle, as part of the investigation of co-worker Adrienne Awoniyi's racial harassment complaint.[120]  Subsequent to two of those interviews, plaintiff began to perceive that she was being retaliated against for her participation in the investigation, and she retained employment discrimination counsel on May 24, 2001.[121]  Plaintiff then filed an EEOC charge against defendant on June 22, 2001.[122]  Plaintiff's employment was terminated three days later, on June 25, 2001.[123]  A final decree was entered in plaintiff's bankruptcy case on July 31, 2001.[124]  This action was filed on January 31, 2002.[125]

Given that timeline, defendant claims that, pursuant to the doctrine of judicial estoppel, this action should be dismissed because plaintiff did not list this action as an asset at any point during the pendency of her Chapter 7 bankruptcy.

The doctrine of judicial estoppel precludes a party from taking a position that is inconsistent with one that she asserted in an earlier judicial proceeding.  *See Chandler v. Samford University*, 35 F. Supp. 2d 861, 863 (N.D. Ala. 1999).  Its purpose is to protect the integrity of the judicial system by preventing litigants from "play[ing] fast and loose with the courts."  *Chandler*, 35 F. Supp. 2d at 863 (quoting *Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 360 (3d Cir. 1996)); *see McKinnon v. Blue Cross and Blue Shield of Alabama*, 935 F.2d 1187, 1192 (11th Cir. 1991) ("Judicial estoppel is applied to the calculated assertion of divergent sworn positions.  The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.")

---

[120] Plaintiff's evidentiary submissions, Tab K (first affidavit of Elizabeth Moore), at Exhibit 9 (Awoniyi investigation summary).

[121] Defendant's evidentiary submissions, Tab R (attorney "authorization to represent" form).

[122] *Id.*, Tab S (Johnson EEOC charge).

[123] *Id.*, Tab T (Johnson amended EEOC charge).

[124] *Id.*, Tab Q (Johnson bankruptcy final decree).

[125] Complaint (doc. no. 1).

(internal quotation marks and citation omitted).   "The applicability of the doctrine of judicial estoppel therefore requires a determination that (1) the positions asserted are in fact inconsistent, and (2) the inconsistency would allow a party to benefit from deliberate manipulation of the courts." *Chandler*, 35 F. Supp. 2d at 863 (citations omitted).

It is well-settled that a debtor's assertion of claims which arose, but were not disclosed, during her earlier bankruptcy proceedings can be interpreted to be the assumption of inconsistent positions. *See Chandler,* 35 F. Supp. 2d at 863 (collecting cases from several fora and observing that, "[b]ecause the bankruptcy court relies on the information disclosed by a debtor, the importance of full disclosure cannot be overemphasized"); *see also Payless Wholesale Dist. v. Alberto Culver, Inc.*, 989 F.2d 570, 571 (1st Cir. 1993) ("A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights.").

The second element of the judicial estoppel analysis requires a demonstration that the plaintiff had both knowledge of, and a motive for concealing, the unscheduled claim, as well as an affirmative duty to make such a disclosure. *See Chandler*, 35 F. Supp. 2d at 864 (citations omitted).

Here, plaintiff filed a declaration in opposition to summary judgment claiming that she did not know that she had a potential claim against defendant when she *filed* her Chapter 7 bankruptcy petition:

> When I met with my bankruptcy attorney to discuss filing bankruptcy, I had no idea that I would eventually have a lawsuit against Knology for race discrimination or retaliation.  Although things had happened to me which I considered to be racially discriminatory, such as being repeatedly referred to as Queen Latifah by Pam Pruitt, being called a black piece of tar by Pam Pruitt and being paid less than Mike Long

> was paid when he held the position of traffic coordinator,[126] I did not intend to file suit against Knology for race discrimination at the time I filed bankruptcy. It was only after Pruitt began to retaliate against me in May of 2001 that I decided to pursue legal action. I did not know before and when I appeared at my discharge hearing in July, 2001 that there was any need for me to list this case as an asset, especially since no lawsuit had been filed at the time.[127]

This portion of plaintiff's declaration is supported by the evidence, which reflects that she did not participate in the Awoniyi investigation until *after* she had *filed* her bankruptcy petition.[128]  Thus, the court cannot fairly say that plaintiff either knew, or should have known, that she would bring this action on the date she commenced her bankruptcy case.

Further, plaintiff did not have an affirmative duty to disclose this action as an asset at a later point in her Chapter 7 bankruptcy case, because the events giving rise to this action accrued *after* her petition was filed and, thus, are properly considered part of her post-petition estate:

> Debtors filing bankruptcy under Chapters 11 and 13 must disclose all legal or equitable interest in property as of the commencement of the case as well as any interest in property the bankruptcy estate acquires after the commencement of the [case].  In contrast, a Chapter 7 debtor retains possession of property acquired after the commencement of the bankruptcy case and thus has no duty to disclose after-acquired property. *Brassfield* [*v. Jack McLendon Furniture, Inc.*], 953 F. Supp. [1424, 1432 (M.D. Ala. 1996)].

*Chandler*, 35 F. Supp. 2d at 864 n.13.  Accordingly, this action is not barred by operation of the doctrine of judicial estoppel because plaintiff neither reasonably had knowledge of the pendency of this action pre-petition, nor did she have a duty to disclose it post-petition.

---

[126] Plaintiff does not assert a disparate pay claim with respect to Mike Long.  *See* plaintiff's brief opposing summary judgment, at 17-19, 29.

[127] Plaintiff's evidentiary submissions, Tab N (Johnson declaration) ¶ 4.

[128] *Id.*, Tab K (first affidavit of Elizabeth Moore), at Exhibit 9 (Awoniyi investigation summary).

-22-

## C.    Race Discrimination[129]

Plaintiff does not argue that she has direct evidence of a racially-discriminatory animus. The court accordingly will evaluate this claim in accordance with the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [a] discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry

---

[129] Plaintiff's race discrimination claims require the same proof to show liability under both Title VII and § 1981. "Thus, the Court will address [plaintiff's] Title VII discrimination claim with the express understanding that the analysis applies to [her] section 1981 discrimination claim as well." *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1181 (N.D. Ala. 1999) (citing *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106.

### 1.    Racially-discriminatory pay

Plaintiff's "First Amended Complaint" (doc. no. 18) alleges that, "[t]hroughout Plaintiff's employment, she was paid less than similarly situated white employees, as well as the white employee who replaced her while she was out on medical leave [Rebecca Wright]."[130]  As noted earlier, plaintiff's declaration filed in opposition to summary judgment asserts that she was "paid less than Mike Long was paid when he held the position of traffic coordinator."[131]  However, plaintiff's brief opposing summary judgment addresses only the difference in pay between plaintiff

---

[130] Plaintiff's first amended complaint (doc. no. 18) ¶ 20.
[131] Plaintiff's evidentiary submissions, Tab N (Johnson declaration) ¶ 4.

and Rebecca Wright.[132]  Further, she makes no mention of, nor does she argue that defendant's pay practices violated, the Equal Pay Act of 1963, 29 U.S.C. § 206(d).[133]  Thus, to the extent that they were ever asserted in the first instance, plaintiff is deemed to have abandoned all disparate pay claims, except for her Title VII and § 1981 claims relating to the difference in pay between herself and Rebecca Wright.[134]

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation . . . because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a).  "To establish a prima facie case of racial discrimination with respect to compensation, the plaintiff must show that [s]he was paid less than a member of a different race was paid for work requiring substantially the same responsibility."  *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1074 (5th Cir. 1981).  Plaintiff has established her prima facie case here because:  (1) she is African American, while Wright is Caucasian; (2) she was paid a lower wage than Wright; and (3) she and Wright performed *exactly* the same job.

Since plaintiff has set forth a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason why Wright was paid more than plaintiff.

Defendant asserts that, when Wright was hired as a temporary employee in May of 2001, her salary was set by the temporary employment agency, based upon a salary range that defendant told the agency it was willing to pay someone with the requisite qualifications.  The record does not reflect the exact pay range that defendant was willing to pay for an employee to perform plaintiff's

---

[132] *See* plaintiff's brief opposing summary judgment, at 17-19, 29.

[133] Of course, the Equal Pay Act is applicable only to *gender-based* wage discrepancies.

[134] *See supra* note 118.

duties while she was under medical restrictions, nor where either plaintiff's or Wright's respective salaries fell within that range.

Defendant further articulates that the $13 an hour wage offered to Wright when she was hired as a permanent employee in June of 2002 reflected the amount necessary to entice Wright to leave her job at an ice skating rink, where she was paid $11.50 an hour.

Since defendant has articulated non-discriminatory reasons for the pay disparity, the burden shifts back to plaintiff to prove that those reasons articulated by defendant are pretext for race discrimination. *See Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) ("Because the plaintiff bears the burden of establishing pretext, [s]he must present significantly probative evidence on the issue to avoid summary judgment.") (internal quotation marks and citations omitted); *Wallace v. Board of Regents of the University System of Georgia*, 967 F. Supp. 1287, 1296 (S.D. Ga. 1997) ("To prove defendant's reason is a pretext for intentional discrimination, plaintiff must produce significantly probative evidence on the issue to avoid summary judgment.") (internal quotation marks and citations omitted); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1309 (M.D. Ala. 1999) ("Plaintiff retains the burden of proving intentional discrimination." (citing *Burdine,* 450 U.S. at 253, 101 S. Ct. 1089)).

Plaintiff asserts that a reasonable trier of fact could infer a racially-discriminatory animus from Wright's wage as a temporary employee, because defendant dictated to the temporary employment agency that it was willing to pay plaintiff's substitute a higher wage than plaintiff herself earned. However, this argument ignores the nature of the transaction between the temporary employment agency and defendant. Indeed, defendant specifies the hourly rate that it is willing to

-26-

pay *before* it learns the identity (or race) of the person who will be filling a position.[135]  Whatever

defendant's reasons for paying plaintiff's temporary replacement a higher wage than plaintiff, it

cannot reasonably be said that defendant's decision was motivated by racial animus.  Plaintiff's

speculation otherwise falls short of constituting the "probative evidence" necessary to prove pretext.

Plaintiff also has not produced probative evidence to indicate that defendant's decision to

pay Wright $13 an hour as a permanent employee is pretextual.  The evidence is undisputed that,

following Wright's resignation as a temporary employee in August of 2001, defendant was unable

to keep the position consistently filled.[136]  Again, plaintiff offers nothing but speculation to cast

doubt upon defendant's assertion that it had to offer Wright a wage of $13 per hour in order to entice

her to resign her job at the ice skating rink (which paid an hourly wage of $11.50) and permanently

fill the traffic coordinator position.

Accordingly, plaintiff has not demonstrated that defendant's articulated nondiscriminatory

reasons for the pay disparity between herself and Rebecca Wright were a pretext for racial animus,

and summary judgment is due to be denied on her racially-discriminatory pay claims.

### 2.     Racially-discriminatory terms, conditions, and fringe benefits of employment

The record reflects that Pruitt permitted her subordinates to make rampant personal use of

company resources.  Plaintiff herself made extensive personal use of these resources.  However, she

asserts that defendant discriminated against her by granting even greater privileges to her Caucasian

co-workers.  Plaintiff claims that defendant was motivated by racial animus when it took the

following actions: (1) plaintiff's cellular telephone was taken away in June of 2001; (2) she was

---

[135] Plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 178; Tab D (Wright deposition), at 13; Tab H (Carlisle deposition), at 112-14.

[136] Plaintiff's evidentiary submissions, Tab B (Pruitt deposition), at 191-92.

compelled to inform Pruitt before leaving for and returning from lunch; (3) she was denied use of the company van; (4) she was not permitted to leave work early on Fridays; and (5) she was denied use of trade accounts.[137]

Essentially, plaintiff is making a disparate treatment claim.  She argues that the appropriate prima facie framework for analysis of this claim is set forth in *Thompkins v. Morris Brown College*, 752 F.2d 558, 562 n.7 (11th Cir. 1985), which indicates that a plaintiff must show that: "(1) she is a member of a protected class, (2) was similarly situated with a person outside of the protected class, but (3) was denied a condition of employment afforded that person."  *Id.*  This court analyzes her claim accordingly.

Plaintiff has failed to make out a prima facie case with regard to her cellular telephone privileges, because she was not similarly situated to her co-workers.  It is undisputed that plaintiff was the only employee in her department that had no legitimate business need for a cellular telephone.

Plaintiff also has not proven that she was similarly situated to her co-workers with regard to the use of the company van.  Plaintiff's argument centers on Mike Long's "personal" use of the van.  The record is undisputed, however, that Long was "on call" after working hours, and made use of the van as transportation to and from his home when answering these calls.

Plaintiff also has not proven her prima facie case with regard to the privilege of leaving work early on Fridays.  The record reflects that, throughout her employment with defendant, plaintiff was

---

[137] Plaintiff's brief, at 32-33.  Plaintiff does not make a race discrimination claim with regard to use of the corporate gasoline card.  Even if she did, however, defendant has produced a legitimate non-discriminatory reason why plaintiff's use of the corporate gasoline card was curtailed, and that reason has not been shown to be a pretext for discrimination.  *See* § II(D)(2)(b) *infra*.

the only hourly-wage employee in her department.[138]  Plaintiff worked a fixed schedule, and her duties never required her to be available on nights or weekends.  All other persons in plaintiff's department were salaried employees, who sometimes were required to work nights and weekends.  Further, plaintiff was on a "90-day review" period, after which she hoped to earn a pay increase.  For all of these reasons, she was *not* similarly situated to her co-workers with respect to how her work day was scheduled.

With regard to plaintiff's usage of so-called "trade accounts," she has not specifically identified any other employee who had rights superior to hers, much less whether those employees were outside her protected class.[139]

Pruitt's requirement that plaintiff inform her before leaving for and returning from lunch also fails because, again, she was not similarly situated to her co-workers.  Unlike everyone in her office, plaintiff was an hourly wage employee.  Thus, when she ceased to eat lunch with her co-workers, Pruitt had to devise another way to keep up with plaintiff's time.  Additionally, plaintiff, unlike her co-workers, had requested a pay raise, and her job performance and duties were being reviewed and revamped in response to that request.

### 3.    Racially-discriminatory termination

Plaintiff claims that defendant terminated her employment because she is African American.  In discharge situations, courts generally require a plaintiff to demonstrate that:  (1) she was a member of a class of persons protected by the statute; (2) she was qualified for the position from

---

[138] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 202.

[139] Further, plaintiff's brief appears to contradict itself on this point — in one section, she argues that she totally denied access to the trade accounts, while in another, she states that she was merely compelled to obtain permission before making personal use of the trade accounts.  Plaintiff's brief opposing summary judgment, at 32-33, 35.

which she was discharged; (3) she nevertheless was terminated; and (4) following her discharge, the defendant either replaced plaintiff with someone outside the protected class, or retained other employees who were not within the protected class, and, who possessed comparable or lesser qualifications. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).

Plaintiff, as an African American female, is a member of a protected class.  Further, her employment was terminated and she was replaced by a Caucasian female.  Given that plaintiff's job performance was not deemed to warrant termination until *after* she complained of discrimination to defendant's Human Resources Administration, during the course of the company's internal investigation of Adrienne Awoniyi's racial harassment complaint, a reasonable jury could conclude that she was, in fact, qualified to perform her job.  Accordingly, plaintiff has set forth a prima facie case.

Plaintiff argues that defendant has failed to set forth a legitimate non-discriminatory reason for her discharge and, thus, summary judgment should be denied on her termination claim.[140]  That argument fails, because defendant's brief clearly asserts that "[p]laintiff's failure to satisfactorily perform her job duties caused her termination, not her race."[141]

The legitimacy of that proffered explanation is brought into question, however, given that Pruitt is reported to have stated that she "was not going to hire any more black employees in her department because they were too much trouble,"[142] and, "until we can get rid of [plaintiff], I'm

---

[140] Plaintiff's brief, at 38-39 (emphasis supplied).

[141] Defendant's brief, at 21.

[142] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 86-87.

going to have her make phone calls."[143]  Those statements are sufficient to raise a fact dispute as to

whether plaintiff's termination was a pretext for race discrimination.  Further, the record does not

provide a convincing explanation for the fact that plaintiff was terminated well before her "90-day

review" period expired.  Summary judgment accordingly will be denied with respect to plaintiff's

racially-discriminatory termination claim.

## D.    Retaliation

Plaintiff claims that her supervisor, Pam Pruitt, retaliated against her after she participated

in the investigation of co-worker Adrienne Awoniyi's racial harassment complaint during the spring

of 2001.

"Retaliation is a separate violation of Title VII."[144]  *Gupta v. Florida Board of Regents*, 212

F.3d 571, 586 (11th Cir. 2000).  A plaintiff generally must prove three elements to establish a prima

facie case of retaliation:  (1) she engaged in statutorily protected expression; (2) she suffered an

adverse employment action; and (3) there was a causal linkage between the protected conduct and

the adverse employment action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095,

1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501,

507 (11th Cir. 2000); *Gupta*, 212 F.3d at 587.

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the
> protected activity and the negative employment action are not completely unrelated,
> the burden shifts to the defendant to proffer a legitimate reason for the adverse action
> . . . .  The burden then shifts back to the plaintiff to prove by a preponderance of the
> evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory

---

[143] *Id.*, Tab N (Neighbors affidavit) ¶ 16.  The statements attributed to Pruitt are properly considered at summary judgment as admissions of a party-opponent.  *See* Fed. R. Evid. 801(d)(2).

[144] This analysis is equally applicable to that portion of plaintiff's retaliation claim based upon § 1981.  *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 1176, 1185 (N.D. Ala. 1999).

conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).

### 1.    Prima facie case

#### a.    Plaintiff's protected activities

Plaintiff has established the first prong of her prima facie case:  she participated in the Awoniyi investigation.  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Plaintiff's participation in the Awoniyi investigation and the EEOC charge she filed on June 22, 2001, are clearly protected by the participation clause of § 2000e-3(a).

#### b.    Adverse employment actions

Plaintiff asserts that the following events constituted adverse employment actions:  (1) her cellular telephone was taken away in June of 2001; (2) she was compelled to inform Pruitt before leaving for and upon returning from lunch; (3) her personal use of the company van was discontinued; (4) she was not permitted to leave work early on Fridays; (5) she was no longer permitted to use trade accounts without prior permission from Pruitt; (6) she was given "to-do lists" by Pruitt; and (7) her employment was terminated.[145]

---

[145] *See* plaintiff's brief opposing summary judgment, at 35.

"An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (discussing an ADA retaliation claim); *see also Gupta*, 212 F.3d at 587 (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Plaintiff's termination clearly is an "ultimate employment decision," and, unquestionably constitutes an adverse employment action. The remainder of the events that she complains about require closer scrutiny, however.

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). In other words, plaintiff "must show a serious and material change" in the terms, conditions, or privileges of the job before a series of employment actions can be described as "adverse." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). An employment action does not become "adverse" simply because an employee dislikes it, or disagrees with it. *See, e.g., Smart v.*

-33-

*Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action."). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

In *Wideman*, the Eleventh Circuit implicitly instructed district courts to view allegedly retaliatory acts not only individually, but also collectively, when observing "that the actions about which Wideman complain[ed] considered *collectively* [were] sufficient to constitute prohibited discrimination." 141 F.3d at 1456 (emphasis supplied) (actions included being improperly listed as a "no-show" for work, being required to work without a lunch break, being reprimanded and suspended, being the subject of negative criticism, being told to report to work and subsequently being informed she was not scheduled to work, being verbally threatened by a supervisor, and suffering delay in treatment for an allergic reaction); *see also Gupta*, 212 F.3d at 587-90 (considering plaintiff's allegations of retaliation both individually and collectively pursuant to *Wideman*, and deeming five of seven retaliatory incidents not sufficiently adverse to warrant scrutiny under Title VII).

In light of the foregoing principles, plaintiff's complaints that (1) she was no longer invited to group lunches, (2) she had to ask for permission before making personal use of trade accounts, (3) she had to inform her supervisor before going to lunch, and (4) she was sometimes given "to-do" lists are not, either individually or in the aggregate, "adverse employment actions," because none of these events impacted the terms, conditions, or privileges of plaintiff's employment to an actionable degree. These events can be characterized as, *at most*, "ordinary tribulations of the workplace." *Anderson*, 181 F.3d at 1178 (internal quotation marks and citation omitted).

-34-

Plaintiff's complaints regarding the curtailment of her personal use of the company-owned cellular telephone, van, and gasoline card are a somewhat closer call, given that these privileges have some pecuniary value and, thus, could possibly be construed as a form of compensation. The court will therefore assume for the moment that denial of these benefits or privileges of employment collectively amount to an actionable adverse employment action.[146]

### c.    Causal linkage

"To establish the causal relation element of her prima facie case of retaliation, [plaintiff] need only show that the protected activity and the adverse action[s] are not completely unrelated." *Wideman*, 141 F.3d at 1457 (internal quotation marks and citations omitted). The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial. At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").

Further, "a close temporal proximity between two events *may* support a finding of a causal

---

[146] As discussed in § II(D)(2)(b) *infra*, however, even assuming that denial of personal use of the company-owned cellular telephone, van, *and* gasoline card together rise to the level of an actionable "adverse employment action," plaintiff still cannot prevail on her claims based on the denial of those privileges, because defendant produced legitimate nondiscriminatory reasons for their curtailment which have not been shown to be a pretext for discrimination.

connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45

(11th Cir. 2001) (emphasis supplied) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231

F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between

the employee's protected conduct and the adverse employment action *is* sufficient circumstantial

evidence to create a genuine issue of material fact of a causal connection") (emphasis supplied));

*see also, e.g., Bass*, 256 F.3d at 1119 ("Close temporal proximity between the protected activity and

the adverse action *may be* sufficient to show that the two were not wholly unrelated.") (emphasis

supplied) (citing *Gupta*, 212 F.3d at 590 ("For purposes of a prima facie case, 'close temporal

proximity' *may be* sufficient to show that the protected activity and the adverse action were not

'wholly unrelated.'") (emphasis supplied) (in turn quoting *Farley*, 197 F.3d at 1337)).

Here, there is no dispute that plaintiff participated in the Awoniyi investigation and, further,

that the purportedly retaliatory-events that plaintiff complains of occurred shortly thereafter. Thus,

plaintiff has established a prima facie case with regard to her termination, and, curtailment of her

personal use of the company-owned cellular telephone, van, and gasoline card.

### 2.    Defendant's proffered nondiscriminatory reasons and pretext

#### a.    Termination

Defendant cites plaintiff's poor work performance as its proffered nondiscriminatory reason

for terminating her employment. While plaintiff admits that she made numerous errors during her

employment, she blames others for many of the mistakes that defendant attributes to her. Wherever

the blame is properly placed, it is apparent that defendant found plaintiff's job performance lacking

*before* she engaged in any protected activity. Indeed, about a month before plaintiff participated in

the Awoniyi investigation, Pruitt assigned plaintiff a score of only "2" out of a possible "5" rating

points on her annual performance review, thus indicating "Improvement Desired."[147] Despite that less-than-stellar assessment, plaintiff requested a pay raise around the same time that she participated in the Awoniyi investigation. In response to that request, plaintiff's supervisory chain of command counseled her further, and demanded that she improve her job performance. Plaintiff's job performance did not improve to defendant's satisfaction, and she was terminated on June 25, 2001.

A reasonable jury could find that defendant's proffered reason for plaintiff's termination is a pretext for retaliatory animus, however, given: (1) the lack of any indication that plaintiff's job was in jeopardy (or that her alleged mistakes were being documented) before her participation in the Awoniyi investigation; (2) Pruitt's post-Awoniyi-investigation statements that she "was not going to hire any more black employees in her department because they were too much trouble,"[148] and, "until we can get rid of [plaintiff], I'm going to have her make phone calls"[149]; and (3) the fact that plaintiff's employment was terminated on dubious grounds well before her "90-day review" period ended.

### b. Curtailment of fringe benefits

Defendant proffers the following nondiscriminatory reasons for denying plaintiff further personal use of certain fringe benefits:

*Plaintiff's cellular telephone was taken away in June of 2001*: Defendant asserts that plaintiff had no business need for a cellular telephone, and the unit plaintiff possessed was given to Long — who did have a legitimate business need for the device, because he was required to, in turn,

---

[147] Defendant's evidentiary submissions, Tab B (Johnson annual performance review).

[148] Plaintiff's evidentiary submissions, Tab A (Johnson deposition), at 86-87.

[149] *Id.*, Tab N (Neighbors affidavit) ¶ 16.

give his personal unit to an operations manager who was traveling out of town.[150]

*Plaintiff was no longer permitted to make personal use of the company van*: Defendant's proffered nondiscriminatory reason for denying plaintiff further personal use of the company van is that Pruitt learned from defendant's general manager, Alan Goodson, that such use violated company policy.[151]

*Plaintiff was denied use of the corporate gasoline card*: Defendant asserts that all employees were denied personal use of the corporate gasoline card after a company-owned van was procured, thus making it unnecessary for any employee to run company errands in his or her personal vehicle.

Plaintiff's offer of pretext as to all of these fringe benefits is the temporal sequence. Plaintiff notes that, because she enjoyed these benefits before the Awoniyi investigation, but not for long thereafter, a reasonable jury could conclude that the nondiscriminatory reasons proffered by defendant are not worthy of belief.[152] Such an argument is not sufficient here, because the mere existence of protected activity does not render all other facts irrelevant, nor does an employee's engagement in protected activity forestall an employer from making legitimate workplace decisions.

It is apparent that, following the Awoniyi investigation and plaintiff's complaints, the "lax" workplace run by Pruitt was brought more closely in line with company policy, both with respect to interpersonal relations, as well as the extensive personal use of company resources and equipment. Plaintiff has produced no evidence, other than temporal proximity, to demonstrate that defendant's ultimate enforcement of its policy prohibiting non-business-related use of the company

---

[150] Plaintiff's evidentiary submissions, Tab J (Long deposition), at 198-99.

[151] Plaintiff claims that Long's use of the van after office hours constituted personal use. Such a claim misconstrues the facts. The record reflects that Long's possession of the van after regular office hours served a business purpose (responding to trouble calls). *See* § I(D)(3) *supra*.

[152] *See* plaintiff's brief opposing summary judgment, at 35.

-38-

van is somehow a sham.  Further, with regard to the cellular telephone and the corporate gasoline card, it is readily apparent that plaintiff had no business need for either of these items and, given the changes in circumstances, those items were needed *for business purposes* elsewhere.  Plaintiff has set forth no evidence, outside temporal proximity, from which a reasonable juror could infer that defendant's proffered reasons for the reallocation of those resources is false.  Summary judgment is due to be granted on plaintiff's retaliation claim, except for that portion relating to her termination.

### III. CONCLUSION

Defendant's motion to file a reply brief is denied.  Defendant's motion for summary judgment is due to be granted as to all of plaintiff's claims, except for those portions of her race discrimination and retaliation claims arising from the termination of her employment.  An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this ___14th___ day of July, 2003.

_____
United States District Judge